UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PATRICK S. STARK**,                                    Case No. 1:14 CV 1044

               Plaintiff,                         Magistrate Judge James R. Knepp II

     v.                                     MEMORANDUM OPINION AND
                                     ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

               Defendant.

### INTRODUCTION

Plaintiff Patrick Stark filed a Complaint seeking review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

On July 20, 2011, Plaintiff filed for DIB alleging a disability onset date of February 24, 2009. (Tr. 150-51). Plaintiff's claim was denied initially (Tr. 78-90) and on reconsideration (Tr. 91-104).  Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 115). On November 16, 2012, Plaintiff (represented by counsel), a medical expert, and a vocational expert ("VE") testified at the hearing, after which Plaintiff was found not disabled. (Tr. 15-77). On March 14, 2014, the Appeals Council denied Plaintiff's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981.

## FACTUAL BACKGROUND

### *Personal and Vocational Background*

Born February 20, 1969, Plaintiff was 43 years old at the time of the hearing before the ALJ. (Tr. 40).  Plaintiff lived with his wife who drove him to the hearing. (Tr. 40).He testified he did not drive except for errands close to home because of difficulty feeling the brake pedal. (Tr. 41). Plaintiff had a high school diploma and completed two years of college but did not graduate. (Tr. 42). Prior to his disability onset, Plaintiff was a tax preparer. (Tr. 42).

In terms of daily activities, Plaintiff said in his function report that it usually took him an hour and a half from waking up until he was functional. (Tr. 176). He would watch TV or read during this time but he could not remember what he watched or read afterwards. (Tr. 176). Once awake, Plaintiff would spend one to two hours in the morning cleaning up the house before having lunch. After lunch, Plaintiff would do outside maintenance or yard work. (Tr. 176). After this, he would take a mid-afternoon nap for an hour, then do more yard work before having dinner. (Tr. 176-77). After dinner, Plaintiff would watch TV until he went to bed around 11p.m. (Tr. 177).

At the hearing, Plaintiff testified he could feed himself but getting dressed on his own was sometimes difficult. (Tr. 60). In terms of chores, Plaintiff testified he did his own laundry and would help with dishes and dusting. (Tr. 59). He would occasionally mow the grass with his riding mower but he indicated his wife did this most of the time. (Tr. 59). He also occasionally did the grocery shopping but again most of the time his wife did this. (Tr. 60).

### *Medical Evidence*

Plaintiff was diagnosed with diabetes in mid-2005. (Tr. 238, 241). On January 25, 2006, he saw Lisa Barlett, MSN, NP-C, in the Cleveland Clinic Foundation's Endocrinology Department for diabetes management. (Tr. 241). Ms. Barlett noted Plaintiff had been working hard on diet portion control and had been exercising to some extent although he had been unable to exercise in December due to a herniated disc. (Tr. 241). His other diagnoses included hyperlipidemia, hypertension, neuropathy, and sciatica. (Tr. 241). Plaintiff was continued on the maximum doses of Amaryl and Glucophage and prescribed Actos. (Tr. 243).

On March 1, 2007, Plaintiff saw Rebecca Kuenzler, M.D., in the Department of Neurology for neuropathy. (Tr. 227-29). Plaintiff reported worsening numbness in his hands and feet which occasionally spread to his ankles or knees causing a burning pain. (Tr. 227). On examination, Plaintiff had 4/5 bilateral toe extension, but otherwise 5/5 strength throughout muscle groups; a 40% reduced pinprick response in his arms distal to mid-forearm and legs distal to the knees; a 10% reduced pinprick response in his feet; and a moderately imbalanced gait where he was able to lift onto his heels and toes but was unable to walk on them. (Tr. 228-29). Dr. Kuenzler stated that Plaintiff's neuropathy was most likely due to diabetes but the rapid progression was concerning. (Tr. 229). He ordered an EMG, labs, and an MRI to test for other potential causes and prescribed Lidoderm patches for symptom control. (Tr. 229).

On July 31, 2010, Plaintiff saw Freddie Fuentes, M.D. who rated his diabetes control as fair but noted it needed improvement. (Tr. 248-49). Dr. Fuentes recommended regular exercise, avoiding alcoholic drinks, and continued diet and weight loss efforts. (Tr. 248-49).

On March 26, 2011, Plaintiff returned to Dr. Fuentes. (Tr. 262-63). Dr. Fuentes noted Plaintiff had normal extremities, normally pulses bilaterally, and had a normal gait with no

involuntary motions. (Tr. 263). He also noted Plaintiff's blood sugar had improved since taking Actos but it still needed improvement. (Tr. 263).

Plaintiff saw Wilfredo Paras, M.D., for a consultative examination on August 26, 2011. (Tr. 287-88). Dr. Paras noted that in addition to Plaintiff's diabetes, he also had problems with bilateral hearing loss which was diagnosed in July 2011, short and long term memory loss since 2006, and been experiencing bilateral hip, knee, and foot pain for some time although x-rays had not been taken and arthritis had not been ruled out. (Tr. 287).   Plaintiff was conversational and seemed able to concentrate and understand fairly well during the visit. (Tr. 287). Plaintiff reported doing four hours of chores such as light cleaning or yard work but said he must rest or nap for two hours before resuming his tasks. (Tr. 287). Dr. Paras said sitting for two and a half hours would cause increased numbness in his legs and that Plaintiff would tolerate standing for an hour or less for the same reasons. (Tr. 287). Plaintiff avoided bending due to pain in his hips and knees but could walk one to two miles before stopping to rest, lift 30 to 60 pounds with both hands, and could climb stairs slowly but could lose his balance. (Tr. 287). Plaintiff's range of motion in his hips was limited on examination due to pain. (Tr. 288). Dr. Paras concluded Plaintiff's general work limitation was light work. (Tr. 288).

Plaintiff was consultatively examined by Richard Halas, M.A., on September 7, 2011, for a psychological assessment. (Tr. 293-98). Plaintiff's chief complaints were memory loss and neuropathy. (Tr. 293). On mental status exam, Plaintiff's mental content was within normal limits, he was oriented for time, place, and person, had a good memory for past events, and was able to do simple calculations. (Tr. 295-96). Mr. Halas noted Plaintiff had quit his tax preparer job "because he could not get along with his brother" and that Plaintiff had more recently attended gunsmith training and was hoping to open a gunsmith shop. (Tr. 293-94). Plaintiff had

4

an average full scale IQ and high average verbal intelligence. (Tr. 298). Mr. Halas diagnosed depressive disorder and assigned a Global Assessment of Functioning ("GAF") score of 55[1]. (Tr. 297). Mr. Halas opined Plaintiff did not have deficits in his ability to understand, remember and carry-out instructions; did not have significant problems in his ability to maintain attention, concentration, persistence, or pace, or perform multi-step tasks; but his depression would restrict his ability to respond appropriately to co-workers and supervision in the workplace; and Plaintiff had some minor problems in his ability to respond to workplace pressure. (Tr. 298).

On September 19, 2011, state agency reviewing physician Dimitri Teague, M.D., reviewed the medical evidence of record and opined Plaintiff could perform light work that only occasionally required climbing ramps or stairs, never required climbing ladders, ropes, or scaffolds, only occasionally involved stooping and only frequently required crouching, kneeling, or crawling. (Tr. 87). Further, Plaintiff had limited hearing and should avoid concentrated exposure to noise. (Tr. 88).

Plaintiff saw Adi Mehta, M.D., on December 28, 2011, for an evaluation of his diabetes. (Tr. 314-17). Plaintiff had a normal gait with no joint pain, stiffness, swelling, or cramping and a full range of motion except in his knees. (Tr. 316). Dr. Mehta continued to recommend diet and blood sugar monitoring. (Tr. 316). Plaintiff saw Dr. Mehta again on April 4, 2012, and his situation was unchanged except that this time no neuropathy was reported in his hands. (Tr. 325-27). Dr. Mehta included obesity as a diagnosis in the records of his October 3, 2012, appointment and Plaintiff continued to struggle to control his diabetes. (Tr. 341-43).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.* at 34.

On August 28, 2012, Dr. Mehta completed a diabetes questionnaire for Plaintiff. (Tr. 336). Dr. Mehta indicated Plaintiff had Type II diabetes, insulin resistance, extremity pain/paresthesia, and psychological problems including depression. (Tr. 336). He opined Plaintiff could work between two and four hours per day, stand from 30 to 60 minutes at one time, sit for two hours at one time, and stand/walk for four to five hours in a workday. (Tr. 336). He indicated Plaintiff could lift ten pounds occasionally and five pounds frequently; balance occasionally but poorly; and would occasionally need to elevate his legs to his waist during the workday. (Tr. 336).  Dr. Mehta said these limitations were due to diabetes, depression, neuropathy, and poor balance. (Tr. 336).

On November 20, 2012, Dr. Mehta completed a residual functional capacity ("RFC") assessment for Plaintiff. (Tr. 348-49). Dr. Mehta opined Plaintiff could occasionally lift up to ten pounds but the lack of feeling in his hands would cause him to have poor grip, drop things, and otherwise have poor dexterity. (Tr. 348). Dr. Mehta further opined that Plaintiff's impairments or treatment would cause him to miss work more than four times per month. (Tr. 349).

<u>Plaintiff's Testimony</u>

Plaintiff testified he had neuropathic pain in his hands, feet, and groin. (Tr. 47). He said the numbness in his feet extended up his legs and that it got better the higher you went on his leg but he had zero feeling in his feet and ankles. (Tr. 48-49). He testified he had pain in his right hip and knee. (Tr. 50). He said he could stand for an hour and a half to two hours maximum; could walk half a mile at one time which would probably take him ten minutes and he sometimes used a walking stick and seldom used a hip brace; he could sit for 45 minutes to an hour; could climb stairs carefully; could only reach as far as his ankles when bending; and could not squat. (Tr. 52-

6

53). Plaintiff testified he could lift ten to twenty pounds. (Tr. 54). He testified he tossed and turned at night and the cold weather aggravated the numbness. (Tr. 54).

Plaintiff testified he could write with a pencil for maybe ten minutes; required slip on shoes; could button buttons but struggled to do so in cold weather even though he heated his house; and struggled to pick up small items. (Tr. 55-56). He testified he had 40% hearing loss but had not yet ordered hearing aids as he was waiting for an upcoming appointment. (Tr. 58). Plaintiff further testified he could not work as a tax preparer because it involved long periods of sitting and he struggled to type on the computer due to the lack of feeling in his fingertips. (Tr. 62).

Medical Expert Testimony

Donald Junglas, M.D., testified at the hearing as a medical expert. (Tr. 67-69). Dr. Douglas testified that Plaintiff did not meet or equal any of the severe impairment listings, specifically listing 2.02 for vision and 2.08 for hearing. (Tr. 67). Dr. Douglas read Dr. Mehta's opinion that Plaintiff could work between two and four hours a day; stand 30 to 60 minutes at a time; sit two hours; stand and walk for a total of four to five hours; lift ten pounds occasionally and five pounds frequently; had poor balance but could balance occasionally; and had to elevate his legs to his waist during the workday. (Tr. 68). Dr. Junglas indicated he did not know why Dr. Mehta said Plaintiff would have said Plaintiff needed to raise his legs during the workday. (Tr. 68). When asked if Dr. Mehta's opinion was supported by objective evidence, Dr. Junglas replied that he concurred with the record because "his doctor knows him better than I do having heard his testimony only once and never examined him. I would not pretend to countermand the doctor's impression." (Tr. 68-69).

VE Testimony

Vocational expert Ted Macy also testified at the hearing. (Tr. 37). The ALJ asked the VE about a hypothetical person with Plaintiff's vocational background who was impaired to the extent Plaintiff had testified at the hearing. (Tr. 70). The VE responded that such an individual would be unable to perform full-time employment. (Tr. 70). Next, the ALJ asked about a second hypothetical individual with Plaintiff's vocational background who was capable of standing or walking for four to five hours in an eight-hour workday; sitting for only two hours at a time with a short break after two hours; lifting ten pounds occasionally and five pounds frequently. (Tr. 70). The VE responded that such a person would be able to perform Plaintiff's past work as a tax preparer. (Tr. 70-71). The VE said such a person could also be a table worker, bench hand, or assembler. (Tr. 71). Then the ALJ asked the VE about a hypothetical person with Plaintiff's vocational background who was capable of a certain range of light work but who could only occasionally climb ramps or stairs; would be advised against working at unprotected heights, or climbing ladders, ropes, or scaffold; could occasionally kneel, crouch, or crawl; would need to work in an environment without a significant amount of background noise due to hearing loss; and would best be suited for a job where he would not be working with hazardous machinery or need to hear a vehicle approaching. (Tr. 72-73). The VE responded that such a person could still perform the same jobs he had previously described. (Tr. 73).

Next, Plaintiff's attorney asked the VE about what if, in addition to the limitations in the ALJ's two prior hypotheticals, the individual would occasionally fall and would frequently drop things; and whose ability to use a keyboard was compromised due to neuropathy in his fingertips. (Tr. 73-74). The VE responded that there would not be jobs available for such a person. (Tr. 74).

*ALJ Decision*

On February 1, 2013, the ALJ found Plaintiff had the severe impairments of diabetes mellitus, obesity, hearing loss, and peripheral neuropathy but that these impairments did not meet or equal a listing. (Tr. 15, 20-22). The ALJ then found Plaintiff had the RFC to perform a range of light work with the additional limitations that he could only stand for four to five hours and sit for six hours in a normal workday; could not climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs; and could only occasionally kneel, crouch, or crawl. (Tr. 23). Further, he could not work in proximity to unprotected heights or dangerous moving machinery and could not work in an environment with significant background noise. (Tr. 23).

Next, the ALJ found, based on the VE testimony, that Plaintiff could perform his past relevant work as a tax preparer, alternatively, there were other jobs that exist in significant numbers that were available to him; therefore, he was not disabled. (Tr. 29-31).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial

evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff asserts (1) the reasons given for assigning limited weight to each of Dr. Mehta's opinions do not constitute good reasons; and (2) the ALJ did not properly weigh the opinion of the medical expert Dr. Junglas. (Doc. 16). Each of these arguments will be addressed in turn.

***Treating Physician Rule***

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Importantly, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p, 1996 WL 374188,

11

at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Dr. Mehta's August 2012 Opinion

Plaintiff first argues the ALJ did not provide good reasons for assigning limited weight to Dr. Mehta's opinion in the August 2012 Diabetes Questionnaire.(Doc.16, at 17-20). The ALJ assigned limited weight to Dr. Mehta's August 2012 opinion for the following reasons:

> Dr. Mehta's August 2012 opinion appears to be based on the claimant's subjective complaints regarding his abilities rather than objective data or clinical findings. Dr. Mehta's treatment notes show the claimant reported walking regularly for exercise, which indicates greater ability for standing and walking than Dr. Mehta suggests (Exhibit 10F, p. 4). Furthermore, Dr. Mehta's opinion that the claimant is not capable of working is inconsistent with the claimant's reports regarding his daily activities. The claimant's ability to spend his mornings performing household chores and his evenings working on cars or other projects in his garage suggests greater endurance for work activity than Dr. Mehta proposes (Exhibit 5E, pp. 2 and 6).

(Tr. 26).

Here, the ALJ assigned limited weight to Dr. Mehta's opinion as inconsistent with the record because Plaintiff's daily activities indicated he could do more. (Tr. 26, 176-77). This constitutes a good reason for rejecting Dr. Mehta's opinion.

Plaintiff contends his own testimony and statements are not enough to discredit Dr. Mehta because (1) the ALJ did not identify any inconsistencies between Plaintiff's testimony and Dr. Mehta's opinion; and (2) the ALJ did not discuss Plaintiff's testimony that he needed to take frequent breaks in between these activities. (Doc. 16, at 17-20).

Plaintiff is correct; the ALJ did not indicate how Dr. Mehta's opinion was inconsistent with Plaintiff's testimony. However, the ALJ discredits Dr. Mehta's opinion, not on the basis of Plaintiff's testimony, but on the basis of Plaintiff's statements made in the function report completed earlier in the disability application process and Plaintiff's own statements to Dr.

12

Mehta. (Tr. 26, 176, 315). The wording of the function report makes it clear: Plaintiff is reporting the work he does around the house as work he does every day. (Tr. 336). While Plaintiff may disagree with the ALJ's conclusion, the amount of work Plaintiff did during the day is a good reason for rejecting a treating physician's opinion. Therefore, the ALJ assessment of Dr. Mehta's opinion is affirmed

Dr. Mehta's November 2012 Opinion

Next, Plaintiff argues the ALJ did not provide good reasons for assigning limited weight to Dr. Mehta's November 2012 RFC assessment. (Doc. 16, at 20-21). The ALJ assessed this opinion as follows:

> Dr. Mehta's November 2012 opinion states that the claimant has significant upper extremity symptoms. These limitations are consistent with claimant's complaints at the October 3, 2012 office visit and the claimant's testimony at the November 16, 2012 hearing (Exhibit 15F, p. 8). However, these limitations are inconsistent with the claimant's ability to complete gunsmith training and his goal to open a gunsmith shop (Exhibit 9F, p.2). Furthermore, the undersigned notes that at a previous office visit on April 4, 2012, Dr. Mehta noted that the claimant had no neuropathic symptoms in his hands (Exhibit 12 F, p. 4). Regarding Dr. Mehta's statement that the claimant would miss more than three days of work a month, he does not provide the basis for this opinion and his treatment notes do not provide a basis for this limitation.

(Tr. 26).

Here, the ALJ concluded Dr. Mehta's opinion that Plaintiff had poor dexterity and would "drop things" is inconsistent with the record, in that Plaintiff had recently completed gunsmith training and was planning on opening a gunsmith shop and that Plaintiff's complaints of neuropathy were inconsistent with the record. (Tr. 26. 293-94, 327). Plaintiff argues his taking gunsmith courses is irrelevant because he applied for disability after his health prevented him from engaging in gunsmithing. (Doc. 16, at 20-21). Plaintiff further argues the ALJ's citation to

an office visit where he did not complain about neuropathy in his hands ignores the fact that neuropathy is often intermittent. (Doc. 16, at 21).

Although the exact timing of the gunsmith coursework is not clear, Plaintiff acknowledges that he took gunsmithing courses "when it became apparent that [he] could no longer perform his duties as tax preparer." (Doc. 16, at 20). This indicates he successfully completed the courses after his February 2009 alleged disability onset date and thus the ALJ could consider this against Dr. Mehta's opinion. Moreover, he told Mr. Halas that he was considering opening a gunsmith shop, indicating he still felt able to repair guns in September 2011, more than two years after his alleged onset date. (Tr. 294). Although Plaintiff argues the gunsmith shop is not relevant, it is reasonable that the ALJ consider that Plaintiff believed he was able to clean and care for guns despite his dexterity problems. Likewise with the neuropathy, even though by itself, a single appointment in which someone did not complain of neuropathy symptoms would appear to not be enough of a reason to discredit a treating physician opinion, the ALJ considered this in addition to other factors such as Plaintiff's plans to open a gunsmith shop. Moreover, the record from the April 2012 visit appears to indicate Plaintiff had not been experiencing hand-neuropathy recently, not just on the day of his appointment. (Tr. 327).

In sum, the fact that Plaintiff did some gunsmithing and did not consistently report neuropathy symptoms in his hands constitute good reasons for assigning limited weight to Dr. Mehta's opinion that Plaintiff had significant limitations due to his dexterity. Further, the ALJ was entitled to assign limited weight to Dr. Mehta's statement that Plaintiff would need to miss three or more days of work per month because Dr. Mehta does not cite to any objective medical evidence to support this requirement.

14

***Medical Expert***

Finally, Plaintiff argues the ALJ erred in his assessment of Dr. Junglas' affirmance of Dr. Mehta's opinion which he rejected with the "bald assertion" that Dr. Mehta's opinion, was based only on Plaintiff's subjective complaints. (Doc. 16, at 21-22).

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. 20 C.F.R. §§ 404.1502, 416.927. This includes state agency physicians and psychologists. *Id.* Medical experts who testify at trial but have not examined the claimant are also evaluated under this standard. 20 C.F.R. § 404.1527g(2)(iii).  The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. 20 C.F.R. § 404.1527(e)(2)(ii). The findings of non-examining sources are evaluated using the same criteria as all other medical opinions. 20 C.F.R. §§ 404.1527(e), 416.927(e)

Here, Dr. Junglas testified he would not disagree with Dr. Mehta's opinion because she is Plaintiff's "treating physician and is in a better position to assess [his] functioning." (Tr. 68-69). This is not a medical opinion.

"Medical opinion" is defined under the regulations as "statements from physicians and psychologists or other acceptable medical sources that reflect judgment about the nature and severity of [claimant's] impairment(s), including his symptoms and prognosis, what he can still do despite impairment(s), and his physical or mental restrictions." 20 C.F.R. § 404.1527 (a)(2).

Dr. Junglas' testimony did not provide his judgment about the nature and severity of Plaintiff's symptoms, what Plaintiff could still do despite his impairments, or any physical or

mental restrictions. Rather, Dr. Junglas summarized the prior medical evidence and declined to question the judgment of another physician based on what he heard at the hearing. Therefore, Dr. Junglas' statement is not a medical opinion and the ALJ was not required to weigh it according to the factors within the regulations. Accordingly, Plaintiff's second assignment of error is without merit.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB applied the correct legal standards and is supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge